# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **CINCINNATI INSURANCE COMPANY**, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 09 C 6359 |
| v. | ) ) ) | Magistrate Judge Jeffrey T. Gilbert |
| **RALSTON BROWN, INC.**, and **GREGORY R. BROWN**, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cincinnati Insurance Company ("CIC") sued Defendants Ralston Brown, Inc. ("Ralston Brown") and Gregory Brown ("Brown") (collectively, "Defendants") for money allegedly owed to CIC under various indemnity agreements between the parties. CIC is a corporation with its principal place of business in Ohio. Gregory Brown is a resident of Wisconsin. Ralston Brown was an Illinois corporation at the time this suit was filed. Relying on the Court's jurisdiction under the diversity statute, 42 U.S.C. § 1332, CIC brought claims of breach of contract, exoneration, and specific performance against the Defendants, and sought a preliminary injunction requiring them to post funds sufficient to cover their obligations to CIC. District Judge Charles Norgle granted the injunction on June 1, 2010, and ordered Defendants to post collateral in the amount of $314,820. (Doc. 24).

CIC later filed a motion for summary judgment, and the parties consented to have Magistrate Judge Martin Ashman conduct any and all proceedings in this case, including the

entry of final judgment. (Docs. 46 & 51). Defendants' counsel withdrew from the case after the motion was filed, and CIC sought default judgment against the corporate defendant, Ralston Brown. (Doc. 67). Judge Ashman granted the default judgment motion on April 14, 2011 because the corporation did not obtain new counsel. (Doc. 84). He later denied CIC's summary judgment motion as it related to the individual defendant because CIC failed to recognize that a choice-of-law provision in the indemnity contracts directed application of Ohio law to the parties' agreements. (Doc. 89). Defendant Brown then filed his own motion for summary judgment on December 5, 2011. (Doc. 111). The motion is now before this Court following the reassignment of the case from Judge Ashman's docket on June 12, 2012. (Doc. 129). After a careful review of the parties' briefs and statements of facts, the Court finds that the motion should be denied.

## I. Background

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts with "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts . . . ." N.D. Ill. LR 56.1(a). The opposing party must then file a response to this statement, as well as its own statement of supplemental facts. N.D. Ill. LR 56.1(b)(3)(C). A party's obligation to support its facts with evidence is mandatory, and the Seventh Circuit has frequently upheld strict compliance with the requirements of Local Rule 56.1. *See*, *e.g.*, *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (noting that "consistent, bright-line enforcement is essential to obtaining compliance with the rule and to ensuring that long-run aggregate benefits in efficiency inure to the district courts").

Brown has only partially complied with this requirement. His fact statement cites a number of communications related to the bond applications described below that are not supported by the evidence Local Rule 56.1 requires. Courts do not consider unsupported fact allegations in deciding whether summary judgment is warranted. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities."). As a result, the following account of events only includes facts that have been properly supported by the parties' Local Rule 56.1 submissions.[1]

Before it was dissolved in December 2009, Ralston Brown was an Illinois corporation that performed sheet metal fabrication and heating, ventilation and air-conditioning ("HVAC") services under the name of Larson Sheet Metal. Gregory Brown was the company's president. (Def.'s SOF at Ex. A). In October 2008, Ralston Brown was the low bidder for replacing HVAC equipment on two projects undertaken by the State of Illinois Tollway – the Downers Grove Maintenance facility ("the M-14 project") and the Dekalb Maintenance facility ("the M-11 project"). (Pl.'s SOF at ¶ 1). Ralston Brown contracted to replace roof-top HVAC units on the M-14 project for a price of $189,744 and to replace unit heaters with infra-red heaters at the M-11 site for $269,099. Ralston Brown then entered a third contract on March 26, 2009 to replace unit heaters for a public construction project with the Schaumburg, Illinois Park District in the amount of $68,044 ("the Schaumburg project"). (*Id*. at ¶ 1).

Illinois law requires state officials to obtain a payment bond from contractors like

---

[1] CIC has combined in one document its response to Brown's fact statement with its own statement of facts. (Doc. 117). The Court cites all references to CIC's response as "Pl's. SOF Resp." and all references to CIC's own statement as "Pl.'s SOF." Brown's fact statement is cited as "Def.'s SOF." CIC has also submitted the affidavit of Michael Fox, who is one of its bond claims managers. (Doc. 118 at Ex. 1). The affidavit is cited as "Fox. Aff."

Ralston Brown that perform work for a political subdivision costing in excess of $5,000, or who undertake work for the State of Illinois costing more than $50,000. 30 ILCS 550/1. Each of the construction contracts Ralston Brown entered required the company to seek payment and performance surety bonds in order to guarantee payments to the company's subcontractors and materialmen. (Pl.'s SOF at ¶ 2). Working through an insurance broker, Brown completed two CinciExpress contract bond applications to CIC on October 9, 2008 for the M-11 and M-14 projects ("the bond applications").[2] (*Id*. at ¶ 3; Def.'s SOF at Ex. A).

The M-11 and the M-14 bond applications both included general indemnity agreements that are identical for both applications ("the indemnity agreements" or "the indemnity contracts"). The two agreements contain a choice-of-law clause applying Ohio law to the indemnity contracts. They state that the bond applicant agreed to:

> Indemnify the Surety and hold it harmless from and against any and all liability, losses, costs, damages, attorney's fees, disbursements and expenses of whatever kind or nature which the Surety may sustain or incur by reason or in consequence of having executed or procured the execution of the Bond or Bonds aforementioned and/or which the Surety may sustain or incur . . . in settling any claims . . . which may be made or brought under or in connection therewith, and/or in enforcing any of the covenants of this Agreement. The Undersigned will pay over, reimburse and make good to the Surety . . . all money which the Surety or its representatives shall pay, or cause to be paid or become liable to pay, by reasons of the execution of any such Bond or Bonds, such payment to be made to the Surety when due, whether the Surety shall have paid out such sum or any part thereof, or not.

(Pl.'s SOF at Ex. A).

The agreements also contain various signature requirements that are central to Brown's

---

[2] Brown also applied for a bond on the Schaumburg project in March 2009. Brown does not seek summary judgment on the Schaumburg bond, but CIC admits that it eventually issued bond number B-9109134 for the Schaumburg project. (Def's. SOF at ¶ 4).

motion for summary judgment. The indemnity agreements state that "two corporate officers must sign below on behalf of the Company[, and] [s]hareholders of the Corporation and their spouses must sign personal indemnity below." (*Id.*). These instructions are announced in a box placed just above the signature lines. They are prefaced by a highlighted and capitalized notice that the requirements are "**IMPORTANT**." (*Id.*). Despite this warning, Brown's wife, who held the corporate office of secretary for Ralston Brown, did not sign. (*Id.* at Ex. A and G). The agreements also require a principal and at least one individual indemnitor to sign. On October 9, 2008, Brown printed the name of "Ralston Brown, Inc." as the principal, and signed his own name twice -- as the company's president and as an individual indemnitor -- on both the M-11 and M-14 indemnity agreements. (*Id.* at Ex. A).

CIC then issued performance and payment bond number B-9108027 for the M-14 project ("the M-14 bond") and bond number B-910828 for the M11 Project ("the M11 bond"). (Def's. SOF at ¶ 4). Unfortunately, Ralston Brown was not able to carry out all of its contractual obligations to the Tollway or the Park District. Brown claims that the Tollway violated its contractual obligations to Ralston Brown by failing to pay invoices within thirty days after the company submitted payment claims. (Pl's. SOF at ¶ 38). The record does not clarify what specific events occurred, but CIC eventually began receiving claims that required it to make direct payments to Ralston Brown's suppliers in some cases, and to arrange for the completion of the company's work in others. (Def.'s SOF at ¶¶ 7-8). These included $172,172.67 for payments related to the M-11 bond, $68,341.67 concerning the M-14 bond, and $43,210.67 in attorney's fees. (Fox Aff. at ¶¶ 11-19). As a result, CIC brought this suit to enforce its rights under the indemnity agreements against Gregory Brown.

## II. Legal Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court views all facts in the light most favorable to CIC as the non-moving party and draws all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. Not all factual disputes will preclude summary judgment; a genuine issue of material exists only where there is sufficient evidence for a jury to "reasonably find for the [nonmoving party]." *Id.* The parties may not rely on mere allegations or speculation in arguing for or against summary judgment. *Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008). Instead, both sides must support their factual assertions with "competent evidence of a type otherwise admissible at trial." *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007). The nonmoving party can escape summary judgment by producing specific evidence that demonstrates why a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(e)(2); *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008).

While the Federal Rules of Civil Procedure provide the standard for summary judgment, state law defines the substantive issues at stake in this diversity action. *Budinich v. Dickinson & Co.*, 486 U.S. 196, 198 (1988) ("[S]tate law generally supplies the rules of decision in federal diversity cases[.]"); *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 321 (N.D. Ill. 2008). As Judge Ashman noted in denying CIC's earlier motion for summary

judgment, Illinois courts ordinarily rely on § 182(2) of the Restatement (Second) of Conflict of Laws to enforce a contractual choice-of-law provision like the one included in CIC's indemnity agreements. *See Hall v. Sprint Spectrum L.P.*, 376 Ill.App.3d 822, 825-26, 876 N.E.2d 1036 (Ill.App.Ct. 2007). Accordingly, Ohio law governs the parties' claims and defenses in this case.

### III. Discussion

As an initial matter, the scope of both parties' claims requires some clarification before the merits of their arguments can be addressed. Brown asks the Court to enter summary judgment and to dismiss all of CIC's claims against him. Although this presumably encompasses payments that CIC alleges are owed under the M-11, M-14, and Schaumburg indemnity contracts, Brown's motion only references the M-11 and M-14 bonds and contracts. The motion does not refer to the Schaumburg agreement at all. In addition, neither party has submitted a copy of the Schaumburg indemnity agreement as part of this proceeding, though Brown provided a copy of it in response to CIC's earlier motion for summary judgment. (Doc. 83 at Ex. I). Without any evidence or argument concerning the Schaumburg indemnity agreement, Brown's motion must be construed as one for partial summary judgment on the M-11 and M-14 agreements only.

For its part, CIC goes beyond arguing that Brown has not carried his burden of showing that the M-11 and M-14 indemnity agreements are invalid. The company also claims that these agreements, as well as the Schaumburg agreement, are valid and enforceable against Brown as a matter of law. If accepted, such a claim would essentially require the Court to enter summary judgment for CIC, even though it is the non-moving party in this proceeding. The merits of reaching a *sua sponte* decision in CIC's favor are discussed below. But the Court does not need

to address the full scope of CIC's argument in order to decide Brown's motion itself. The only relevant issue for doing so is whether the evidence Brown has submitted is sufficient to show that the M-11 and M-14 agreements are invalid as a matter of law. The Court can conclude that Brown has not carried his burden of proof under Fed. R. Civ. P. 56 without also finding that the indemnity agreements are, in fact, valid contracts that should be enforced against Brown at this juncture. With these limitations in mind, the Court turns to Brown's motion.

A.      **The M-11 and M-14 Contracts**

Under Ohio law, indemnity "is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement." *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 240, 513 N.E.2d 253 (1987). Indemnity arises from an express or implied contract, and its nature is determined by the parties' intent as reflected in the language they use in the agreement. *Id*. A contract is valid under Ohio law if it includes an offer, acceptance, contractual capacity, consideration, mutual assent, and consideration. *Williams v. Ormsby*, 131 Ohio St.3d 427, 429, 966 N.E.2d 255 (2012). The mutual assent factor is strongly evidenced by the parties' signature to the contract at issue, though such evidence can be rebutted. *Parklawn Manor, Inc. v. Jennings-Lawrence Co.*, 119 Ohio App. 151, 156, 197 N.E.2d 390 (Ohio.App.Ct. 1962) ("It is basic to contract law that there can be no contract without a meeting of the minds. A signature to a contract is evidence that the parties' minds met on the terms of the contract as executed.").

Brown argues that he and CIC did not have a meeting of the minds because his insurance broker, the Coyle-Varland Insurance Agency, told him that the October 9, 2008 documents he signed were "applications only" and did not explain that the indemnity agreements were part of

the application forms he filled out on behalf of Ralston Brown. (Def's. Mot. at 2). No evidence supports this claim. Brown has not submitted an affidavit or other evidence concerning any aspect of his communications with the insurance broker. Even if he had, the language of the indemnity agreements contradicts Brown's implicit claim that he either did not understand the nature of the documents he signed, or that he was denied a meaningful opportunity to familiarize himself with the terms of the agreements. Those agreements were attached to the bond applications, and they unambiguously state that the agreements were "for the purpose of inducing [CIC] . . . to become surety on the Bond or Bonds" that Brown was seeking. (Def's. Mot. at Ex. A). The indemnity agreements also state in clear terms that the persons who signed them agreed to indemnify CIC for any payments that CIC might subsequently be obligated to pay under the bonds as the surety party. (*Id.*).

Ohio law presumes that the parties to contracts "have read and understood them and that a signatory is bound by a contract that he or she willingly signed." *Preferred Capital, Inc. v. Power Eng. Group, Inc.*, 112 Ohio St.3d 429, 432, 860 N.E.2d 741 (2007). *See also ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 503, 692 N.E.2d 574 (1998) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained."). The same rule applies in Illinois, where Brown signed the bond applications and indemnity agreements. *See*, *e.g.*, *IFS Credit Corp. v. Rieker Shoe Corp.*, 378 Ill.App.3d 77, 93, 882 N.E.2d 382 (Ill.App.Ct. 2007). Despite his broker's alleged silence, Brown should have known from the contracts' terms that the indemnity agreements were an integral part of the bond applications and that he was bound by the terms of the indemnity language he signed.

Brown argues that the contracts are still unenforceable because they were never fully executed. As noted above, the agreements state that Brown's wife must sign as both Ralston Brown's corporate secretary under the "Principal" section and as Brown's spouse under the "Indemnitor" portion of the contracts. Mrs. Brown did not sign either agreement as a principal or as a personal indemnitor. According to Brown, this omission automatically renders both the M-11 and the M-14 indemnity agreements invalid.

The Court disagrees that Mrs. Brown's failure to sign the documents, at least without more, necessarily invalidates the contracts. Ohio caselaw is clear that "[s]ignature spaces in the . . . contract do not in and of themselves require that the signatures of the parties are a condition precedent to the agreement's enforceability." *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 152, 375 N.E.2d 410 (1978). *See also Allen v. Ford Motor Co.*, 8 F. Supp.2d 702, 705 (N.D. Ohio 1998) ("A contract may be effective [in Ohio] even though the written instrument evidencing its terms has not been executed."); *Am. States Ins. Co. v. Honeywell, Inc.*, No. 56552, 1990 WL 19319, at *5 (Ohio.App.Ct. March 1, 1990) ("The existence of a valid contract does not necessarily require the signature of all the parties to the contract."). Brown's claim that the mere absence of his wife's signatures is enough to set aside the indemnity contracts contradicts these authorities. That is not to say that Mrs. Brown's failure to sign is simply irrelevant to the enforceability of the contracts, as CIC suggests. But it does mean that the agreements cannot be construed as invalid for summary judgment purposes on the sole ground that she did not sign them.

Ohio law shows that, instead of depending on a bright-line rule, the validity of a partially-executed contract must be assessed in light of the facts that surround the parties'

subsequent actions or, in other cases, according to the contract's terms. Partial execution does not necessarily invalidate a contract if the parties' later behavior shows that they intended to proceed as if the contract were binding. *See Hocking Valley Comm. Hosp. v. Comm. Health Plan of Ohio*, No. 02CA28, 2003 WL 21904586, at *3 (Ohio.App.Ct. Aug. 6, 2003) ("Performance can substitute for execution of a written contract against the party who did not execute the contracts . . . as well as against the party who executed the contract.") (citation omitted). On the other hand, a contract is not enforceable if it specifically states that its terms are not binding until a specific person signs, and the required signature is missing. *Allen*, 8 F. Supp.2d at 705; *Arnett v. Midwestern Enterprises, Inc.*, 95 Ohio.App.3d 429, 434, 642 N.E.2d 683 (Ohio.App.Ct. 1994) (finding that a court could not disregard language stating that "this order shall not become binding until accepted by dealer or his authorized representative").

Both Brown and CIC cite the signatory requirements of the contracts at issue in this case as a basis for their competing views of whether the contracts are enforceable. Liberally construed, Brown claims that the contracts should not be viewed under the Ohio rule that missing signatures are not always fatal to validity because the specific signatory instructions in the agreements make his wife's signatures a condition precedent for the contracts' enforceability. CIC responds that the partially-executed contracts *must* be construed as valid under the usual Ohio rule because the signatory instructions do not explicitly condition the contracts' enforceability on all signatures being present.[3]

---

[3] CIC also argues that the contracts are enforceable because they contain the following language: "If any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party." (Pl.'s Resp. at 10-11). Although the Court does not reach the validity of the indemnity contracts, it notes that this language does not state, as CIC implies, that Brown is automatically liable even if Mrs. Brown did not sign the contracts.

The Court finds neither of these arguments persuasive. CIC is correct that the language of the agreement does not unambiguously make all the parties' signatures a condition precedent to the formation of a binding agreement. Brown overlooks in this regard that the contracts' terms nowhere state that they will only take effect if all the required signatures are present. That does not mean, however, that CIC is correct in stating that the contracts are binding as a matter of law without Mrs. Brown's signature. CIC drafted the form contracts, saw fit to require certain signatures, and underscored those requirements by setting them off in a box titled "**IMPORTANT**." Neither party has addressed how Ohio law would interpret the effect of these instructions.

It may be that Ohio law would interpret this language as detailed enough to impose execution requirements that make Mrs. Brown's signature necessary. On the other hand, it may also be that the absence of an explicit statement that the contracts would not take effect without all signatures is sufficient to revert to the ordinary Ohio rule for construing partially-executed contracts. The more relevant point at this stage is that neither party has recognized that the indemnity agreements fall in a middle ground between documents with no directive at all as to how they should be executed, and contracts that make all signatures a condition precedent for enforcement of their terms. The Court will not address these issues for Brown and CIC because, as Judge Ashman noted in his earlier order, courts do not make legal arguments for the parties.

---

The language contemplates the liability of "every other party" only when another "party signing this Agreement" is not liable. Mrs. Brown did not sign either agreement. Thus, the second half of the quoted sentence, which is conditioned on the non-liability of a *signing* party, does not define the scope of Brown's potential liability. Brown's point is more fundamental: the agreements are not enforceable against him in their entirety, and he is not bound by any of their terms.

(Doc. 89 at 10, citing *Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.*, No. 03 C 9421, 2010 WL 3034419, at *3 (N.D. Ill. July 27 , 2010)).

That said, the contracts could still be binding if the parties' subsequent behavior showed that they intended to be bound by the agreements' terms. *Hocking Valley Comm. Hosp.*, 2003 WL 21984586, at *3. To succeed on his motion, Brown must demonstrate why that is not the case. He has not addressed the issue, however, and the record is clear that at least some performance took place under the M-11 and M-14 bonds that CIC eventually issued to Ralston Brown. Brown concedes that he paid the premiums on the M-11 and M-14 bonds on March 6, 2009, and he clearly did so despite his wife's missing signatures. (Pl.'s SOF at ¶ 15). Combined with the facts that CIC actually issued the bonds Brown applied for, and that Brown began the Tollway work with the bonds in place, there is at least some evidence that the parties' subsequent actions may have made the indemnity agreements binding on Brown even without his wife's signatures. That is all that is needed to create a material fact dispute that leads the Court to conclude that Brown is not entitled to summary judgment as a matter of law at this juncture, and his motion is denied.

**B. CIC's Response**

CIC has not filed a motion for summary judgment, but its response claims that the Court should "find in favor of [CIC] that a valid contract exists between all parties." (Def's. Mem. at 13). This essentially requests a *sua sponte* entry of summary judgment on Brown's liability to CIC, much of which is quantified by the affidavit of Michael Fox and the invoices attached to it. (Doc. 118 at Ex. 1). A court can grant judgment in favor of a non-moving party under some cirumstances. Most critically, (1) the parties must know that summary judgment is under

consideration, (2) the non-moving party must show that no genuine issue of material fact exists, and (3) that party must also show that it is entitled to summary judgment when the law is applied to such facts. *See Goldstein v. Fidelity and Guar. Ins. Underwriters, Inc*., 86 F.3d 749, 750-51 (7th Cir. 1996). In *Goldstein*, for example, the district court agreed with the moving party's version of the facts, but found that summary judgment against him was justified because a correct interpretation of the law showed that the non-moving party was entitled to judgment as a matter of law. *Id*. at 751. The Seventh Circuit stated that such a *sua sponte* action "warrants 'special caution,' and . . . [is] often inappropriate." *Id*. (citing *Sawyer v. United States*, 831 F.2d 755 (7th Cir. 1987)).

Several factors support exercising such caution here. Brown is proceeding *pro se* in this case. It is true that "the pro se status of an opponent does not impose any special duty on a litigant." *Provident Sav. Bank v. Popovich*, 71 F.3d 696, 699 (7th Cir. 1995). But CIC still had an affirmative duty under Local Rule 56.1 to notify a *pro se* party like Brown that it was seeking summary judgment as part of its response and to file the notice as a separate document. CIC did not do so, and it is clear from Brown's reply that he did not understand the implications of CIC's request for judgment in its favor. (Doc. 122).

Moreover, CIC has not met the second of the three *Goldstein* factors. CIC seeks judgment on all three indemnity contracts, including the Schaumburg agreement. Like Brown, however, CIC has not presented any evidence concerning that agreement, and it is not part of the summary judgment record before the Court. Even if it were, CIC has not addressed fundamental issues concerning that contract. The Schaumburg agreement, which Brown provided as part of the earlier summary judgment record, was signed on March 23, 2009. (Doc. 83 at Ex. I). Like

the M-11 and M-14 agreements, Mrs. Brown did not sign the Schaumburg contract. Unlike the earlier agreements, however, Brown signed only as president of Ralston Brown, not as a personal indemnitor. This makes the Schaumburg agreement even more facially questionable than the M-11 and M-14 contracts. CIC has not presented any argument on how Brown can be held personally liable for payments made under the Schaumburg bond when he did not sign the indemnity contract as a personal indemnitor.

In addition, CIC has not submitted evidence on most of the $50,609.65 CIC claims Brown owes as an indemnity payment. Judge Ashman noted that CIC had failed to substantiate a $45,476.01 payment to G. W. Berkheimer Co., Inc. that CIC claims to have made on behalf of Ralston Brown. (Doc. 89 at 6-8). CIC's statement of facts and Fox's affidavit, which CIC also relied on the earlier summary judgment, failed to make any mention of this payment. For reasons that are unclear, CIC has submitted the same affidavit here, and the company has again failed to present evidence supporting its claim on the Berkheimer payment.

Thus, even assuming the Court entered summary judgment *sua sponte* for CIC on the M-11 and M-14 bonds, a further proceeding would still be required to settle the parties' dispute on the Schaumburg bond. The Court will not proceed in such a piecemeal fashion and will not consider CIC's request for judgment in its favor on any of the three performance bonds at issue in this case. *See Goldstein*, 86 F.3d at 751 (stating that entering summary judgment *sua sponte* is "largely unnecessary, as a district court can always invite a non-moving party to file a motion for summary judgment in its favor").

## IV. Conclusion

For these reasons, Brown's motion for summary judgment [111] is denied. The matter is set for a status hearing on October 17, 2012 at 10:30 a.m. to discuss further proceedings necessary to resolve this case.

ENTER:

_____
JEFFREY T. GILBERT
United States Magistrate Judge

Dated: September 25, 2012